LASSER, P.J.T.C.
These consolidated local property tax eases involve Fairleigh Dickinson University’s (FDU) claim for tax exemption for its Florham Park-Madison campus under the N.J.S.A. 54:4-3.6 exemption for educational institutions. Exemption of the land is the sole issue. It was stipulated that FDU owns 148 acres in Florham Park and 30.4 acres in Madison.[1]
Florham Park granted exemption for 50 acres for tax year 1981 and assessed the remaining 98 acres at $1,479,000. The University contested this denial of exemption for the 98 acres by filing a direct complaint with the Tax Court.
Madison granted exemption for one acre for tax year 1980 and assessed the remaining 29.4 acres at $793,800. FDU appealed to the Morris County Board of Taxation which granted exemption *347 for the entire 30.4 acres. Madison sought review of this action in the Tax Court.
I
The Florham Park-Madison campus, hereinafter “FP-M campus,” was formerly the Twombly estate. The mansion has been preserved and converted to college use and remains a focal point of the property. The formal gardens, lawns and trees have been preserved and adapted to student activities.
Dr. James B. Griffo, Provost of the FP-M campus testified that the FP-M campus is a total community campus. FDU’s educational program is not limited to classroom experience. The parklike setting and beauty of the campus aid the college in attracting students, and the entire campus contributes to the academic and personal growth of the students. Dr. Griffo testified in detail to the physical nature of the campus. He described the land, its topography and vegetation, the buildings and the activities of the students and faculty on the campus.
The central portion of the campus is devoted to an academic loop, around which are grouped most of the academic and administration buildings. Within the academic loop, a forested area containing specimen trees has been preserved as a nature trail.
Student dormitory areas and recreational areas are outside the academic loop. The uses of recreational areas in Florham Park and Madison vary from traditional varsity and intramural sports to sunbathing and frisbee playing. Other areas in Florham Park and Madison are devoted to picnicking, nature walks and outdoor botany and entomology classes.
Dormitories are located in the southeast area of the Florham Park portion of the campus. Facilities for dining and student activities are nearby. There is ample parking for faculty, resident and commuter students and visitors. Planted areas provide buffer zones to shield the buildings from parking areas, public roads and boundary areas.
*348 There is no master plan for development of the college. Present plans give priority to additions to the gymnasium and the library.
Student enrollment overall has not changed over the last ten years although the undergraduate-graduate and resident-commuter mix has changed. The campus meets the college’s needs at the present time, but Dr. Griffo is unable to predict whether it will in the future because of changing needs in education. Dr. Griffo testified that in his opinion, all of the land is necessary for the use of the buildings for university purposes.
Dr. Griffo described 43 buildings in Florham Park, identifying them as follows:
Description of Buildings Building Nos.[2]
1. The original Twombly mansion 1
2. Dormitories located in the dormitory village. Of 2-10 these nine buildings, eight are attached in pairs, with a small area of common wall, but they are otherwise physically separate buildings
3. A men’s dormitory 11
4. A dormitory lounge building 12
5. A women’s dormitory 13
(Buildings 11, 12 and 13 are separate buildings joined by small areas of common wall and fire doors)
6. Infirmary 14
7. Student center 15
8. Library 16
9. Student personnel services building attached to 17 the library by a small area of common wall with a fire door
10. Equal Opportunity Fund building 18
11. Counseling center 19
*349 12. Psychology classroom building 20
(The counseling center and the psychology classroom building are joined by a small area of common wall)
13. Maintenance building 21
14. Earth science building 22
15. Lecture hall/seminar hall building 23
16. Greenhouses 24
17. Storage building at the athletic field 25
18. Dreyfus College classroom building 26
19. Recreation building and gymnasium 27
20. Storage building 28
21. West cottage classroom, lab and office building 29
22. East cottage classroom, lab and office building 30 (Buildings 29 and 30 are attached at one corner)
23. Science building 31
24. Office building north of psychology classroom 32 building
25. Boiler room and carpentry shop 33
26. North gazebo 34
27. South gazebo 35 (The gazebos contain faculty offices)
28. Mail room 36
29. Pump houses 37, 38 & 39
30. Boiler room 40
31. Guard houses 41, 42 & 43
The three buildings and parking area in Madison are used for the university press, public relations, capital campaign, alumni activities, counseling senior citizens and records storage. Utility lines servicing the buildings are to be found throughout the FP-M campus.
*350 The Madison and Florham Park portions of the campus are separated by the tracks of the Erie Lackawanna Conrail Railroad. These tracks are elevated and an underpass connects the two portions of the campus. There is a road from the main entrance on Madison Avenue (Route 24) in Madison to the Florham Park portion of the campus.
Malcolm Kasler, a qualified city planner, testified on behalf of FDU that the original estate was designed and built in the 1890s. Stanford White was the architect and Frederick Olmstead was the landscape designer. Their design of the estate set the pattern for the adaptive reuse by the University.
Kasler divided the land use into eight categories and calculated the land areas in these categories in acres as follows:
1. Land for buildings, light and air
2. Roads, pathways and parking areas
3. Formal recreation areas (football, baseball, tennis, etc.)
4. Buffer areas
5. Outdoor teaching areas
6. Utilities services
7. Formal gardens, landscaping, open space and other buffer areas
8. Future use areas and contingencies
Total
Florham
Park
32.4
20.87
6.05
6.75
17.36
14.36
1.48
33.85
13.76
146.88 acres
Madison
.51
.99
3.67
4.66
1.45 '
1.44
-0-
1.62
16.26
30.6 acres
Kasler testified that all of these areas are necessary for the operation of the university. The future use and contingency areas were described by him as seldom used.
*351 Madison Portion of Campus
Harvey Moskowitz, a qualified city planner, testified on behalf of Madison that the Madison portion of the campus is separated from the Florham Park portion by a railroad embankment and has a totally different land use. Moskowitz stated that because of falling enrollment at the FDU FP-M campus, future expansion areas will not be needed by the university, and the increasing value of land makes the land in Madison best suited for other than university purposes.
Moskowitz concluded that one acre is devoted to the three small buildings, 3.2 acres to the baseball field and the buffer between it and South Oak Court, and one acre to the roadway to the Florham Park campus, for a total of approximately five acres. In Moskowitz’s opinion, the compost area, the tree nursery, the area used by botany classes and a 20-foot-wide strip for underground utility lines are not exempt uses. He stated that the compost area could be located anywhere on the Florham Park campus and that FDU, as owner of the land, did not need a 20-foot width to gain access to underground utilities. Moskowitz said that there was insufficient information regarding the botany classes to conclude that the wooded area was necessary for university purposes. He said that there was no evidence of the frequency of use of wooded areas or the existence of rare or unique plant species. It was the witness’ opinion that the university’s use of the property for tree nursery or compost purposes did not mean such use was necessary.
Moskowitz testified that there are no planning standards for land area requirements of a university because universities vary from urban to rural and vary in function. Moskowitz agreed that the historical, landscaped and buffer areas were desirable but not necessary.
William Bate, a qualified real property appraiser, tax consultant and former member of the Board of Assessors of Madison, testified to FDU’s initial application in 1958 for exemption of five acres in Madison. In 1970 this exemption was reduced to one acre at the instance of the Morris County Board of Taxa *352 tion. In Bate’s opinion, only one acre should be exempt as necessary for the fair enjoyment of the three buildings. This includes one-half acre for the buildings and one-half acre for the roadway. In his opinion, use of the Madison land is not related to buildings in Florham Park.
There is no contest over the number of buildings in Madison. Madison contends that the three buildings actually use only one acre of land. It argues further that if the maximum exemption of five acres per building, or a total exemption of 15 acres, is allowed based on these three Madison buildings, the remaining 15.4 acres in Madison cannot be exempted based on buildings located in Florham Park. Therefore, with respect to Madison I must determine:
1. How many acres are necessary for the fair enjoyment of and are actually and exclusively devoted to the use of the buildings.
2. Whether these acres are necessary and actually and exclusively devoted to the three Madison buildings.
3. Whether buildings in Florham Park qualify to support exemption of land in Madison in excess of 15 acres.
Florham Park Portion of Campus
John Murray, the assessor of Florham Park testified that his predecessor in office had granted the FDU exemption. His review of the assessment records showed that 50 acres were exempted and 90.6 acres were taxed. He testified that a five-acre exemption was allowed for each of the following buildings or building groups.
1. Mansion
2. Science Building
3. Recreation Building, West Cottage, East Cottage
4. Dreyfus Building
5. Equal Opportunity Fund Building, counseling center, psychology classroom, maintenance building, earth science building and lecture hall, office building east of psychology classroom, main boiler room, greenhouse, boiler room for earth science building.
6. Library, student personnel services
7. Student Center
8. Dorm Village Dormitories
9. Twombly Hall Dormitories
*353 10. Infirmary, guard house, two pump houses and one reservoir building
The buildings were either (1) combined into one building, as in the case of dormitory buildings; (2) not counted as buildings, as in the case of guard houses, or (3) incorporated into the overall exemption without specific identification. Two storage buildings, one at the athletic field and one east of the recreation building, were not included on the property record card. Two gazebos and a mail building were included with the mansion building.
Murray testified that there is no assessing standard or authority for determining whether a structure is one building, several buildings or not a building at all. He also testified that, in his opinion, an additional 20 acres should be exempted, for a total exemption of 70 acres.
Peter Abeles testified as a qualified planning expert for Florham Park. His studies resulted in three different sets of land use figures for the university, as follows:
1.
2.
3.
Florham
Park Madison
Total
Actual use - May 4 & 5, 1982
Absolutely necessary use (20% less than actual use)
Use to accommodate 25% growth by year 2010
86 7.624 93.624 acres
68.805 6.094 74.899 acres
114.675 3.165 117.838 acres
It was Abeles’ opinion that a smaller quadrangle arrangement is better suited to the needs of the university and that the 2,500-foot distance across the academic loop between the residential area and the Dreyfus Building is excessive. In Abeles’ master plan the baseball field would be relocated to the academic loop, requiring a relocation of the entrance road and considerable site work.
Abeles found a total of 20 structural buildings (excluding accessory buildings) and 32 functional buildings in Florham *354 Park. He concluded that although some buildings were functionally separate, they were structurally combined and should be counted as one.
The parties are not in agreement on the number of buildings qualifying for exemption in the Florham Park portion of the campus. FDU contends that there are 43 buildings in Florham Park while Florham Park contends that only 20 structures in Florham Park qualify as buildings under the statute. Therefore, with respect to Florham Park, I must determine:
1. How many structures located in Florham Park qualify as buildings under the statute.
2. How many acres are necessary for the fair enjoyment of and are actually and exclusively devoted to the use of these buildings.
II
FDU contends that its FP-M campus is a single, integrated, educational community and that its total land area of 178.4 acres is reasonably necessary for the fair enjoyment of the college buildings.
N.J.S.A. 54:4-3.6 provides in part:
The following property shall be exempt from taxation under this Chapter: all buildings actually used for colleges....
I am satisfied from the proofs that FDU is an educational institution entitled to local property tax exemption. I am also satisfied that the buildings are actually and exclusively used by the university for educational purposes. These conclusions are not disputed by the taxing districts.
N.J.S.A. 54:4 — 3.6 further provides that exemption will be granted to:
... the land whereon any of the buildings hereinbefore mentioned are erected, and which may be necessary for the fair enjoyment thereof, and which is devoted to the purposes above mentioned and to no other purpose and does not exceed 5 acres in extent....
Land of an educational institution meets the statutory test for exemption if it:
1. Is necessary for the fair enjoyment of the buildings,
2. Is actually and exclusively devoted to the purposes of the buildings, and
3. Is not in excess of five acres for each building.
*355 All property must bear its just and equal share of the public burden of taxation, and statutes granting exemption from this burden are strongly construed against those claiming exemption. Princeton Univ. Press v. Princeton, 35 N.J. 209, 214, 172 A.2d 420 (1961). However, exemption statutes must also be construed reasonably so as not to defeat their evident legislative design. Princeton Tp. v. Tenacre Foundation, 69 N.J.Super. 559, 563, 174 A.2d 601 (App.Div.1961). In accord with these principles, “fair enjoyment” has consistently been equated with “use,” and to be considered “necessary” land need not be absolutely indispensable to the exempt buildings as long as it is “reasonably necessary” to accomplish the purposes of the organization seeking exemption. Boys Club of Clifton, Inc. v. Jefferson Tp., 72 N.J. 389, 401, 371 A.2d 22 (1977).
Therefore, I find that FDU may hold up to five acres of exempt land for each of its buildings if the land is reasonably necessary for actual and exclusive university uses.
The taxing districts contend that acreage not specifically identifiable with the use of specific buildings cannot qualify for exemption. In Boys’ Club, supra, the taxing district contended that land not necessary for the uses connected with the mess hall, dormitories and infirmary at a boys’ summer camp was not necessary for the fair enjoyment of those buildings and not entitled to exemption. The court rejected this contention, stating that the camp must be viewed as a whole, with the buildings and surrounding land constituting “integrated components” necessary for the proper operation of the camp. The court stated that to deny tax exemption to land not specifically related to the dining, sleeping and medical uses of the buildings would be to ignore the purpose of the camp project, which was to promote the mental and moral improvement of the campers and which depended, in part, on the natural environment of the surrounding land. (At 401-403, 371 A.2d 22).
A university’s purpose is not merely to educate its students but to contribute to their moral and mental growth. These purposes are accomplished both in the classroom and *356 through the natural environment of the campus. Like the summer camp in Boys’ Club, FDU must be viewed as a whole in relation to its purpose and not merely as a composite of unrelated, individual buildings. Therefore, it is neither necessary nor desirable to identify specific acres of the campus with specific buildings in considering tax exemption of university property.

The Florham Park Buildings

I conclude that a structure is a building for the purpose of the five-acre exemption test even if a small part is attached to an adjoining structure and even though there may be a fire door connecting it with another structure. I find that, for the purpose of the five-acre exemption test, the two gazebos are not separate structures but are part of the mansion and that the three guard houses are not buildings. There was no evidence that the guard houses were of sufficient permanence to be considered buildings. See Salvation Army v. Alexandria Tp., 2 N.J.Tax 292 (Tax Ct.1981).
I find that there are 37 buildings in Florham Park, as follows:
Description of Buildings No. of Buildings
1. The mansion, used as administrative offices, classrooms and book store 1
2. Dormitories 12
3. Infirmary 1
4. Student Center 1
5. Library 1
6. Student Personnel. Services Building 1
7. Equal Opportunity Fund Building 1
8. Counseling Center 1
9. Psychology classrooms 1 •
10. Maintenance Building 1
11. Earth science Building 1
12. Greenhouse 1
13. Storage Building 1
*357 14. Dreyfus College 1
15. Recreation Building and Gymnasium 1
16. Storage Building 1
17. West cottage classroom, lab and office building 1
18. East cottage classroom, lab and office building 1
19. Science Building 1
20. Office Building north of Psychology Classroom Building 1
21. Boiler room and carpentry shop 1
22. Mail room 1
23. Pump houses 3
24. Boiler room _1
Total buildings in Florham Park 37

Florham Park and Madison Land

I must determine the amount of land in Florham Park and Madison “necessary for the fair enjoyment of the buildings.” Following the reasoning of Boys’ Club, supra, use of the FP--M buildings should be considered in relation to the purposes of a university. In addition to an area for light and air for buildings, adequate land must be available for university needs such as access, traffic, parking, utilities and buffering of university activities from neighboring residential areas. In addition, and to the extent available, land is desirable for extracurricular activities such as athletics, as well as for walking and sitting in the out-of-doors to enjoy the solitude and aesthetics of the natural surroundings.
I cannot accept the argument that a university which has the benefit of an expansive, attractive and historical campus should not be permitted to use large open areas for university purposes, even though campuses in urban settings operate successfully without similar open areas. I cannot accept the argument that *358 less land would be necessary if certain improvements were relocated.
I conclude that use must be determined based on the campus as it exists. The university decision to design the campus around the existing estate rather than to completely rebuild the campus cannot be the basis for holding that some land is not necessary for university use.
The argument that FDU is experiencing a reduction in full-time undergraduates and an increase in part-time graduate students does not justify anticipating a change in use until it actually occurs. Assessment is a yearly process. When a change in use occurs, such change can then be reflected in the assessment.
Areas testified to by FDU’s expert as future use areas in many instances are strips of seldom used land between existing university uses. They separate university uses such as parking lots from classrooms and contribute to the parklike setting of the university. They are not separable from the campus as a whole. They are an integral part of the campus, have a necessary relationship to existing uses, and should not be excised from surrounding tax-exempt land. It is not essential for exemption purposes that every foot of the campus be trod upon. See Mahwah Tp. v. Bergen Cty., 3 N.J.Tax 513, 541 (Tax Ct.1981).

Florham Park

I find that six acres at the intersection of Danforth Road and Park Avenue are not presently used for educational purposes, are not a reasonably necessary part of the integrated campus and are separable from the campus.
I find that eight acres at the northeast corner of the campus at Park Avenue and the border with St. Elizabeth’s College are in the same category. However, a portion of this area is used as a disposal area for the college, to which I allocate two acres. The balance of six acres is not presently used for educational *359 purposes, is not a reasonably necessary part of the integrated campus and is separable from the campus.
I therefore conclude that 12 of the 148 acres in Florham Park are not actually and exclusively used for educational purposes and are not entitled to exemption.
The maximum land exemption permitted is five acres for each building. Twenty-eight buildings would be necessary to exempt 136 acres in Florham Park. Since I have found that there are 37 buildings in the Florham Park section of the campus, there are more than enough buildings to exempt 136 acres under the five-acre test. I have concluded that it is not necessary to associate specific land with a specific building and I find that 136 acres in Florham Park are entitled to exemption.

The Madison Land

In Madison the university actively uses one acre of land at the Route 24 entrance as the main entrance to the campus and for the three buildings located there. An additional 17 acres are devoted to educational uses as follows:
1. Thirteen acres on the northerly side of the main entrance road for athletic activities and buffer areas, an attractive area for the entrance road and to provide for utilities and other roads. Portions of the 13 acres consist of seldom used strips of land between these uses. They are not separable and therefore are included in the exemption.
2. Four acres on the southerly side of the main entrance road for an attractive university entrance, utilities and an area used for botany and entomology study.
I therefore find that 18 of the 30.4 acres in Madison are devoted to educational uses and are entitled to exemption if they meet the five-acre test.
The remaining 12.4 acres of FDU land in Madison are not presently used for educational purposes, are not a reasonably necessary part of the integrated campus and are separable from the campus. Therefore I find that these 12.4 acres in Madison are not entitled to exemption.
The three buildings in Madison will support exemption of 15 acres. However, I find that the FP-M campus is to be regarded *360 as an integrated whole. The dividing line between the two taxing districts places 37 buildings in Florham Park and three buildings in Madison. If the entire campus were in a single taxing district, these 40 buildings would support a maximum exemption of 200 acres. Specific land need not be identified with specific buildings to be entitled to exemption. Boys’ Club, supra. The statute does not state that the five-acre test must be applied separately to each taxing district if a college is located in more than one taxing district. I conclude that because the FP-M campus is an integrated campus used for a single educational purpose, notwithstanding its division by the railroad embankment and the municipal boundary line, its 40 buildings would support exemption of 200 acres if these acres were actually and exclusively used for educational purposes. Cf. Plainfield v. Goodwill Home & Missions, Inc., 4 N.J.Tax 537 (Tax Ct.1982). To the extent that the land in Madison used for educational purposes exceeds 15 acres, the exemption of the additional three acres is supported by buildings in Florham Park.
FDU’s expert stated that the Madison land was in a university district zone. There was no proof of the permitted uses and limitations in this zone, and FDU did not argue that it was entitled to exemption based on the zoned use. Exemption is governed by actual use, not permitted use.

Assessment of Nonexempt Land

The parties have stipulated that the value of the land is not in issue and that there are 148 acres in Florham Park and 30.4 acres in Madison. At the trial, I stated that I intended to use the calculated per acre assessments for acreage found not exempt, and the parties made no objection to this procedure. I find that nonexempt FDU land in Florham Park and Madison should be assessed at the calculated per acre assessments, there being no evidence, other than the exemption claim, that the assessments are incorrect. The per acre land assessment in Florham Park is $15,000 and in Madison $27,000. The 12 acres held not exempt in Florham Park are to be assessed at $180,000 *361 ($15,000 X 12 acres), and the 12.4 acres held not exempt in Madison are to be assessed at $334,800 ($27,000 X 12.4 acres).
The Clerk of the Tax Court is directed to enter a judgment for 1980 in the Madison case and for 1981 in the Florham Park case, granting exemption to the 178.4 acres of land on the FDU FP-M campus with the exception of 12 acres in Florham Park and 12.4 acres in Madison, resulting in assessments as follows:
Madison 1980
Land
Improvements
Total
Florham Park 1981
Land
Improvements
Total
$334,800
-0-
$334,800
$180,000
-0-
$180,000

The land areas testified to by each of the expert witnesses varied somewhat from these stipulated acreages.

As shown on Exhibit P-9.