3 A.3d 593 (2010)
416 N.J. Super. 127
HUNTERDON MEDICAL CENTER, Plaintiff-Appellant,
v.
READINGTON TOWNSHIP, Defendant-Respondent.
Docket No. A-4262-08T3
Superior Court of New Jersey, Appellate Division.
Argued May 12, 2010.
Decided August 31, 2010.
Susan A. Feeney argued the cause for appellant (McCarter & English, LLP, attorneys; Ms. Feeney, of counsel; Ms. Feeney and Daniel P. Zazzali, Newark, on the brief).
Martin Allen argued the cause for respondent (DiFrancesco, Bateman, Coley, Yospin, Kunzman, Davis & Lehrer, P.C., attorneys; Mr. Allen, of counsel; Mr. Allen and C. Justin McCarthy, Warren, on the brief).
Before Judges CUFF, PAYNE and MINIMAN.
The opinion of the court was delivered by
*594 PAYNE, J.A.D.
Plaintiff, Hunterdon Medical Center (HMC), appeals from a decision of Tax Court Judge Kuskin, reported at 24 N.J.Tax 421 (Tax 2009), denying it an exemption, pursuant to N.J.S.A. 54:4-3.6, from local property taxes imposed for the years 2000, 2001 and 2002[1] by defendant, the Township of Readington, on a physical therapy service (PT Service) operated by HMC at an off-site facility approximately nine and one-half miles from the hospital in Whitehouse Station. The facility houses a physical fitness center, known as the Hunterdon Health and Wellness Center (Wellness Center), a cardio-pulmonary rehabilitation service (CP Rehab Service), the PT Service, and a hospital-owned pediatric practice.
In an initial decision by Judge Kuskin, he denied tax-exempt status to all facilities except the CP Rehab Service. Hunterdon Med. Ctr. v. Readington Twp., 22 N.J.Tax 302, 339-40 (Tax 2005) (HMC I). In doing so, the judge developed a methodology for determining whether the various components of the hospital-owned facility were "actually used" for a permitted exempted use, set forth in the governing statute as "hospital purposes." Id. at 332-33. We affirmed Judge Kuskin's methodology and conclusions. Hunterdon Med. Ctr. v. Twp. of Readington, 391 N.J.Super. 434, 918 A.2d 675, 23 N.J.Tax 536 (App.Div.2007) (HMC II). Certification was granted solely with respect to the tax status of the PT Service. Hunterdon Med. Ctr. v. Twp. of Readington, 192 N.J. 72, 926 A.2d 856 (2007). On appeal, the Supreme Court clarified the standards to be employed in determining tax-exempt status in this context, modifying to some extent the methodology adopted by Judge Kuskin and affirmed by us. Hunterdon Med. Ctr. v. Twp. of Readington, 195 N.J. 549, 573-74, 951 A.2d 931 (2008) (HMC III). Because the Court was uncertain whether Judge Kuskin would reach the same conclusion regarding the PT Service under its revised methodology, it remanded the matter to him for his reconsideration. Id. at 574, 951 A.2d 931. After supplementation of the record by HMC with a certification regarding a regulatory approval granted to the PT Service in 2007 and hospital accreditations that included the PT Service, the judge reexamined the record in light of the Supreme Court's opinion and reached the same conclusion that he had reached initiallythat the PT Service was not tax exempt. Hunterdon Med. Ctr., supra, 24 N.J.Tax 421 (HMC IV). HMC has appealed.

I.
Our evaluation of Judge Kuskin's opinion requires an extended discussion of the applicable tax exemption statute and the Supreme Court's construction of it in the present context. N.J.S.A. 54:4-3.6 governs tax exemptions for enumerated non-profit entities, providing in connection with non-profit hospitals:
The following property shall be exempt from taxation under this chapter:... all buildings actually used in the work of associations and corporations organized exclusively for hospital purposes, provided that if any portion of a building used for hospital purposes is leased to profit-making organizations or otherwise used for purposes which are not themselves exempt from taxation, that portion shall be subject to taxation and the remaining portion only shall be exempt....
*595 In its decision in HMC III, the Supreme Court noted its prior recognition that N.J.S.A. 54:4-3.6 requires that three criteria be met in order for property to be exempted from taxation: "`(1) [the owner of the property] must be organized exclusively for the [exempt purpose]; (2) the property must be actually ... used for the tax-exempt purpose; and (3) its operation and use of its property must not be conducted for profit.'" 195 N.J. at 561, 951 A.2d 931 (quoting Paper Mill Playhouse v. Millburn Twp., 95 N.J. 503, 506, 472 A.2d 517 (1984)). The Court then stated that, because there was no longer a dispute that HMC met the first and third Paper Mill criteria, the dispute as presented to it focused on "whether the hospital's operation of a PT Service in this off-site building constitutes hospital-owned property that is `actually used' for the permitted exempt purpose, which N.J.S.A. 54:4-3.6 identifies only as `hospital purposes.'" Id. at 562, 951 A.2d 931.
The Court recognized that, commencing with our decision in Township of Princeton v. Tenacre Foundation, 69 N.J.Super. 559, 564, 174 A.2d 601 (App.Div.1961), New Jersey courts had utilized a "reasonably necessary" test in determining whether a particular facility or use met Paper Mill's second criterion in a hospital, ancillary use context, the issue turning on whether a facility was reasonably necessary for the accomplishment of hospital purposes. Id. at 562-69, 174 A.2d 601. However, the Court found, as had Judge Kuskin, that "[t]he reasonably necessary test does not assist in the determination of whether a hospital, in embarking on a medically oriented task, has exceeded permissible `hospital purposes' because the test itself does not define `hospital purposes.'" Id. at 567, 174 A.2d 601 (citing HMC I, supra, 22 N.J.Tax at 326). The Court concluded that "[t]he key is to infuse meaning into the concept of `hospital purposes' so that the statutory exemption can be consistently applied." Id. at 568, 174 A.2d 601.
In defining "hospital purposes," the Court observed:
In our view, any effort to encapsulate what a hospital must provide for its patient population reasonably would include any service, medical and diagnostic, required by its patients. Such required services necessarily would include services needed both pre- and post-admission to the hospital, whether as an in-patient or out-patient.
[Id. at 569, 174 A.2d 601.]
Looking for guidance to regulations governing hospital services, the Court noted that N.J.A.C. 8:43G-2.12, a regulation listing professional departments, services, facilities and functions that a general hospital must provide, required the existence of a physical therapy department. Id. at 569-70, 174 A.2d 601. Further the Court noted that regulatory authorities recognized "the precious nature of space within the confines of a hospital's main facility," id. at 570, 174 A.2d 601, and had permitted certain types of medical operations to be placed on non-adjoining property while still recognizing them "as sufficiently integrated with the main hospital to be classified as hospital-based, and not free-standing." Ibid. (citing N.J.A.C. 8:43G-2.11(c)). But the Court noted:
It cannot be overlooked, however, that to remain "hospital-based" in a regulator's eyes, a distant hospital-operated medical service is required to show incorporation with hospital departments, supervision by hospital administrators, and adherence to common policies and procedures for administrative matters including admission of patients without regard to ability to pay, in order to keep such distant operations to the same *596 standards that patients could expect from a hospital's main facility.
[Id. at 571, 174 A.2d 601.]
As the result of its review of regulations governing hospitals, the Court recognized three principles for courts to utilize when engaging in the "fact-sensitive task of reviewing the tax-exempt eligibility of particular hospital property." Ibid. The Court stated:
First, we hold that the definition of a hospital as a twenty-four-hour continuous care operation is overly restrictive for purposes of the analysis. The early hospital tax-exemption cases did not focus on the range of medical activities engaged in by entities actually organized to operate as hospitals.
[Ibid.]
Rather than defining hospitals as "a twenty-four-hour, continuous care medical and nursing operation," id. at 572, 174 A.2d 601, the Court held "that any medical service that a hospital patient may require pre-admission, during a hospital stay (whether it is for less than a day or for one or more days), or post-admission, constitutes a presumptive core `hospital purpose' under N.J.S.A. 54:4-3.6." Ibid.
As its second principle, the Court held that "whether the hospital delivers such services in the hospital's main facility, in another facility on the main campus, or in a hospital-owned building adjoining or adjacent to the main hospital campus makes no difference" in determining the applicability of the statutory tax exemption. Ibid. However, as its third principle, the Court held that
as the hospital-used property is situated away from the main hospital campus and adjacent or adjoining property, concerns about hospital integration and supervision become more pronounced, even when the use is for a core hospital purpose as identified above. In such circumstances, it is relevant that regulators examine off-site medical care facilities for functional integration and for supervision by hospital personnel for reasons complementary to the reasons that we strictly apply the tax exemption to buildings actually used for "hospital purposes" under N.J.S.A. 54:4-3.6. See N.J.A.C. 8:43G-2.11(c).
[Id. at 573, 174 A.2d 601.]
For tax-exemption purposes, the Supreme Court then utilized much of the test initially developed by Judge Kuskin and affirmed by us, thereby developing three factors to test "the importance and the integration of the proposed use to the hospital's accomplishment of a legitimate task." Ibid. They are:
1. The nature and extent of the services provided at the off-site location;
2. The extent to which the activity conducted in the facility is under the control or supervision of the hospital medical staff, or personnel;
3. Whether the facility serves primarily hospital patients and employees or primarily members of the general public.
[Ibid.]
In a footnote to the third factor, the Court stated, in language that has been variously construed on remand and in the context of the present appeal:
We agree with the Tax Court's factual determination that the CP Rehab patients were patients of HMC and would reach the same conclusion for the PT patients served at the Center. See, e.g., N.J.A.C. 8:43G-2.11(c) (setting standards for hospital-based ambulatory care service facilities in respect of patient medical records, billing, and access to all hospital services).
[Id. at 573 n. 16, 174 A.2d 601.]
*597 The Court held additionally that if the hospital has not been licensed to perform the activity at issue off-site, two additional, non-dispositive, factors are to be considered in connection with the third factor: (1) whether the facility competes with similar commercially-owned facilities; and (2) whether the facility is predominantly utilized by hospital patients and employees or by the general public. Id. at 574, 174 A.2d 601.
In conclusion, the Court remanded the matter to the Tax Court for further consideration pursuant to the principles it had established, stating:
Based on the test articulated herein, we are uncertain that the Tax Court's determination in respect of the PT Service, to which we would ordinarily accord substantial deference, should be affirmed. The integration of that Service with the HMC seemed to be coextensive with that found for the CP Rehab Service. Also, because our definition of core "hospital purposes" would presumptively include the delivery of physical therapy services on an out-patient basis, which could be, and were at one time, provided at the main HMC campus, we question whether the PT Service at the Center should receive different treatment. Last, to the extent that the court required medical supervision, our analysis eschews such a narrow approach to the type of supervision required.
[Ibid.]

II.
On remand, the Tax Court adhered to its prior decision that the PT Service was not tax exempt. In reaching that conclusion, the judge first noted his prior factual findings, which included the fact that, during 1999, 2000 and 2001, HMC offered physical therapy services at the hospital, at the Wellness Center and, commencing in December 2001, at another location in a Healthquest fitness center. In 2002, the out-patient physical therapy service located at the hospital was moved to an off-site office building, and the other two off-site facilities continued their operations. HMC IV, supra, 24 N.J.Tax at 424 (quoting HMC I, supra, 22 N.J.Tax at 312). HMC's PT department had a part-time, hourly-paid clinical coordinator with no medical background.[2] Although a Medical Director existed, that person was not present in the building and he did not review treatment plans. Ibid. In 1999, the PT Service treated twenty-five people per week, a number that increased to forty in 2000 and continued at that level in the succeeding two years. Ibid. During the years in question, the PT Service exclusively occupied two second-floor rooms. Four pieces of equipment, located outside the treatment room, were primarily dedicated for the use of PT patients. Ibid. (quoting HMC I, supra, 22 N.J.Tax at 338). Any member of the general public with the appropriate prescription could utilize the PT Service. A particular form of therapy did not need to be recommended. No HMC medical supervision occurred, and the PT staff was wholly comprised of non-physicians. Ibid.
On remand, Judge Kuskin found additionally that no admission to the Hospital was required in order to utilize the PT Service and, after the 2003 amendment to the Physical Therapist Licensing Act of 1983, a physician's prescription was no longer required. Id. at 424-25 (citing *598 N.J.S.A. 45:9-37.13, L. 2003, c. 18, § 1). Billing was done by the hospital's billing office. Appointments were made directly with the PT Service. Id. at 425. Treatment plans were developed by the PT Service and sent for informational purposes to the referring physician, if any. Ibid. No evidence was presented as to the number of people treated at the PT Service who anticipated hospital admission or received therapy upon discharge. Also, there was no evidence that charity care was provided. Ibid.
Addressing the Supreme Court's decision, Judge Kuskin noted that the Court, in footnote sixteen, had suggested that PT Service patients, like CP Rehab patients, were patients of HMC. He noted as well the Court's statement that "because our definition of core `hospital purposes' would presumptively include the delivery of physical therapy services on an out-patient basis, which could be, and were at one time, provided at the main HMC campus, we question whether the PT Service at the Center should receive different treatment." However, the judge concluded that these statements were not dispositive of the issues before him. Id. at 429.
The judge then turned to the three factors identified by the Supreme Court. With respect to the first, the "nature and extent of services provided," the judge concluded that "the physical therapy services provided at the PT Service were among those previously provided within the main hospital building. Thus, the PT Service might be deemed part of a hospital physical therapy service contemplated by N.J.A.C. 8:43G-2.11(d)[3]." Ibid. However, the judge, quoting HMC III, supra, 195 N.J. at 572, 951 A.2d 931, found that because HMC had not established that the services were provided "pre-admission, during a hospital stay ... or post-admission," the hospital had not established facts giving rise to the presumption that the PT Service constituted a "core hospital purpose." HMC IV, supra, 24 N.J.Tax at 429.
With respect to the second factor, whether the PT Service was "under the control or supervision of the hospital medical staff, or personnel," the judge concluded that "the degree of control or supervision by hospital medical staff and personnel with respect to the PT Service was substantially and significantly less than their control and supervision of the CP Rehab Service." Id. at 429-30. In this context, the judge presented a chart comparing the two services. He noted that, to obtain services, CP Rehab Service patients were required to register at the main hospital and obtain a physician's referral and approval of the proposed treatment plan. Additionally, periodic progress reports were sent to the physician. In contrast, PT Service patients registered at the Service and might not need a physician's prescription or referral. Although a proposed treatment plan was sent to the referring physician, if there were one, no approval was required.[4]Id. at 430.
In evaluating control and supervision by hospital medical staff, the judge noted that the medical directors of cardiac and pulmonary rehabilitation reviewed the treatment plans and medical records of CP Rehab Service patients referred by physicians who were not on the hospital's staff. The hospital's Medical Director of Physical Therapy, in contrast, did not review treatment plans, and the physical therapy department *599 was run by a part-time clinical director with no medical training. Ibid.
With respect to control and supervision by other hospital personnel, the judge noted that billing for both services was done through the hospital billing office and budgeting and capital expenditures for each were determined by hospital business personnel. Ibid. Both services utilized hospital employees. However, the CP Rehab Service was supervised by the Vice-President of Patient Care Services, whereas the PT Service was supervised by the Vice-President of Physician Practices. Ibid. In this regard, the judge found the differences in supervisor to be of greatest significance, noting that the Vice-President of Patient Care Services was responsible for services that appeared to fit the definition of core hospital services, whereas the Vice-President of Physician Practices was generally responsible for services that were ancillary to the hospital's core purposes. Id. at 430-31.
With respect to the third factor, whether the facility serves "primarily hospital patients and employees or primarily members of the general public," the judge concluded, as he had previously, that HMC had "failed to establish that the PT Service served primarily Hospital patients who were referred to the service for continuation of treatment." Id. at 431 (quoting HMC I, supra, 22 N.J.Tax at 339). The judge was particularly influenced in this regard by the Court's definition of a "core hospital purpose" as one consisting of services required pre-admission, during a hospital stay, or following discharge. Ibid.
Determining that HMC had failed to establish that the PT Service was licensed during the years in question, the judge also examined the two additional factors identified by the Court. He determined that the evidence suggested that the PT Service competed with other physical therapy facilities operated by HMC, but he stated that he could not determine from the record whether the PT Service had commercial competitors. Id. at 432-33. He did not separately discuss the second additional factor, finding it to be "virtually identical to the third of the Three Factors." Id. at 432.
As a consequence of his analysis, the judge again found that HMC had failed to meet its burden of establishing that the PT Service qualified for a tax exemption pursuant to N.J.S.A. 54:4-3.6. This appeal followed.

III.
Our review of the opinion of Judge Kuskin on remand, in light of the Supreme Court's decision, satisfies us that in some respects the judge misconstrued the Supreme Court's directives. Thus, we do not offer the deference that we would customarily accord to his views. Yilmaz, Inc. v. Dir. Div. of Taxation, 390 N.J.Super. 435, 443, 915 A.2d 1069 (App.Div.), certif. denied, 192 N.J. 69, 926 A.2d 854 (2007). In that connection, we disagree with the judge's conclusion that HMC failed to demonstrate that the services provided by the PT Service fulfilled a core hospital purpose. As the Supreme Court recognized, for regulatory purposes, HMC was required to maintain a physical therapy department. It did so, initially providing both in-patient and out-patient services that clearly fit within the hospital's core purposes. Because the PT Service provided services that had previously been offered at the hospital, until they were moved off-site in 2002, the judge found the PT Service "might" be considered to be fulfilling a core hospital service. Id. at 429. However, the judge found that, because the physical therapy was not necessarily administered pre-admission or post-admission, *600 it failed to fulfill a core hospital purpose. Ibid.
We regard this further requirement to unduly restrict the type of services falling within the hospital's core purposes. Although we recognize that the Court, on two occasions in its opinion, used the pre-and post-admission language, we are unwilling to conclude that a service must be so tied to a hospital admission in order to constitute part of the hospital's core purposes. Rather, we would rely on the Court's definition of a hospital's core purposes to include "any service, medical and diagnostic, required by its patients," HMC III, supra, 195 N.J. at 569, 951 A.2d 931, including but not limited to those administered pre-admission and post-discharge.
We similarly conclude that the judge misapplied the third factor set forth by the Supreme Court"[w]hether the facility serves primarily hospital patients and employees or members of the general public." In this case, a question existed as to whether members of the Wellness Center who were not seeking physical therapy nonetheless utilized the equipment principally dedicated to patients of the PT Service. Viewed in that light, a valid distinction could be drawn between hospital patientsthose patients receiving therapy through the PT Serviceand members of the general publicthose persons paying fees to utilize the equipment of the Wellness Center. Because our review of the record suggests that the PT Service's equipment was utilized primarily for physical therapy, we find the third factor set forth by the Court to have been met.
In our view, the second factor, gauging the integration between the hospital and the PT Service, is the crucial consideration in this case. In evaluating that factor, we recognize that physical therapy may be somewhat sui generis among the services offered by HMC in fulfilling its core purposes. This is so because physical therapy is planned and administered by specially trained and licensed physical therapists, not by the medical personnel who oversee the majority of the hospital's other core functions. Thus, lack of medical oversight does not necessarily provide evidence of lack of integration with the hospital, but is simply indicative of the fact that medical oversight over physical therapy is not the norm.
With that crucial distinction in mind, our review of the record on appeal[5] satisfies us that the PT Service enjoys the same level of integration with the hospital that the out-patient physical therapy service had when it was located within the hospital's confines. We recognize in this regard that the service that was previously located in the hospital was moved to a building on Sand Hill Road, in close proximity to the hospital. The tax status of the Sand Hill Road facility does not appear in the record. However, it appears likely that, if it were tax exempt when functioning from the hospital itself, that status would remain, despite its present off-site location.
The record contains no evidence that the PT Service is operated in a fashion different from the physical therapy facility at Sand Hill Road or that the services provided at the two facilities differ.[6] Both facilities, *601 as well as in-patient physical therapy, are directly overseen by the same person, Donna Manzo-Dragon, who reports directly to the Director of Rehabilitative Services, who is in turn overseen by the Vice-President of Physician Practices. Both operate pursuant to the Hospital's by-laws and in accordance with its policies, practices and procedures. The facilities' employees are employees of HMC, albeit largely part-time. Financial integration exists; billing occurs through the hospital; and all revenues are placed in the hospital's operating account. Any profit earned by the facilities is considered general revenue, utilized by the hospital for capital expenses, charity care, and to fund the expenses of other cost centers. Purchasing is handled centrally, as are human resources. Budgeting requires hospital approval. Further, the physical therapy facilities are covered by the hospital's license and accreditation and its liability and malpractice insurance policies.
It is clear that the medical integration that exists in connection with the CP Rehab Service does not exist in connection with the PT Service. However, as we have previously stated, cardio-pulmonary rehabilitation is delivered in a fashion different from physical therapy. Moreover, the Supreme Court has cautioned against imposing a requirement of medical supervision in determining an off-site facility's eligibility for tax exempt status. HMC III, supra, 195 N.J. at 574, 951 A.2d 931.
We recognize the familiar principle that "[t]ax exemptions are not favored as they depart from the fundamental concept that everyone should bear a just and equal share of the public burden of taxation." HMC II, supra, 391 N.J.Super. at 445, 918 A.2d 675 (citing Princeton Univ. Press v. Princeton, 35 N.J. 209, 214, 172 A.2d 420 (1961)). Nonetheless, our analysis of the record in light of the three considerations identified by the Supreme Court,[7]id. at 573, 951 A.2d 931, leads us to conclude that HMC has met its burden of demonstrating that the PT Service is sufficiently integrated into HMC's delivery of its core hospital purposes to warrant a local property tax exemption pursuant to N.J.S.A. 54:4-3.6. N.J. Carpenters Apprentice Training & Educ. Fund v. Borough of Kenilworth, 147 N.J. 171, 189, 685 A.2d 1309 (1996), cert. denied, 520 U.S. 1241, 117 S.Ct. 1845, 137 L.Ed.2d 1048 (1997); Paper Mill, supra, 95 N.J. at 506-07, 472 A.2d 517. Accordingly, we reverse the contrary conclusion of the Tax Court.
Reversed.
NOTES
[1] The parties have agreed that the decision would govern similar exemption claims filed by HMC for the tax years 2003, 2004 and 2005.
[2] She is a licensed physical therapist with a Master's Degree in physical therapy from Columbia University.
[3] We assume the judge meant (c), there being no paragraph (d).
[4] The record reflects that physician approval is required for Medicare patients.
[5] The record contains hearing transcripts, HMC's application to the New Jersey Department of Human Services, Division of Medical Assistance and Health Services for certification status required to receive hospital-based reimbursement under the Medicaid program and resultant certification, and various accreditation reports by the Joint Commission on Accreditation of Healthcare Organizations. It does not contain answers to interrogatories or other discovery.
[6] Sand Hill can provide wound care that cannot be provided at either of HMC's other physical therapy facilities. However, we find that distinction to have no weight in our analysis.
[7] We note the absence of any evidence of commercial competition to the PT Service in the Whitehouse Station area.